IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

EMILY V. MIXON-DAVIS      )
                              )
v.                              )     No. 2:14-0067
                              )     Magistrate Judge Holmes
NANCY A. BERRYHILL        )
     Acting Commissioner of    )
     Social Security[1]        )

To:    The Honorable Kevin H. Sharp, Chief District Judge

**R E P O R T   A N D   R E C O M M E N D A T I O N**

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Social Security Administration ("Commissioner") denying Plaintiff's claim for Supplemental Security Income ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's motion for judgment on the administrative record (Docket Entry No. 16), to which Defendant has responded (Docket Entry No. 22).

Upon review of the administrative record as a whole and consideration of the parties' filings, the undersigned Magistrate Judge respectfully recommends that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) be **GRANTED** and that the Commissioner's decision be **REVERSED** and **REMANDED** for further administrative proceedings.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. INTRODUCTION

Plaintiff filed an application for SSI on November 30, 2004. *See* Transcript of the Administrative Record (Docket Entry No. 11), at 39-40.[2] She alleged a disability onset date of June 1, 2000. AR 39-40. Plaintiff asserted that she was unable to work due to bowel incontinence, nerves, depression, and being a "slow learner." AR 37-38, 41.

Plaintiff's applications were denied initially on May 24, 2005 and upon reconsideration on September 1, 2005. AR 28. Pursuant to her request for a hearing before an administrative law judge ("ALJ"), Plaintiff appeared with counsel and testified at a video hearing before ALJ Joan A. Lawrence on May 18, 2007. AR 986. On September 24, 2007, the ALJ denied the claim. AR 26-27. However, the Appeals Council approved Plaintiff's request for review of the ALJ's decision, and remanded the decision back to the ALJ for further consideration on December 1, 2009. AR 69-72. Plaintiff again appeared with counsel and testified at an additional hearing before ALJ Joan A. Lawrence on February 22, 2011. AR 1010. On June 24, 2011, the ALJ again denied the claim. AR 12-14. The Appeals Council denied Plaintiff's second request for review of the ALJ's decision on January 13, 2012. AR 4-6. Plaintiff proceeded to file a complaint in the District Court for the Middle District of Tennessee, after which Defendant filed a motion to remand the case for a new hearing to hear additional evidence, which the Court granted on September 12, 2012. AR 1070.

On September 10, 2013, Plaintiff appeared with counsel and testified at a video hearing before ALJ James Dixon. DE 20 at 3.[3] On April 16, 2014, the ALJ denied the claim (AR 1050-

---

[2] The Transcript of the Administrative Record is hereinafter referenced by the abbreviation "AR" followed by the corresponding Bates-stamped number(s) in large black print in the top right corner of each page. All other filings are hereinafter referenced by the abbreviation "DE" followed by the corresponding docket entry number and page number(s) where appropriate.

[3] The transcript of this hearing was filed as a separate document to supplement the record contained at Docket Entry No. 11. *See* DE 20. Therefore, for purposes of clarity, the Court will refer to

52), thereby making the ALJ's decision the final decision of the Commissioner.[4] This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. THE ALJ FINDINGS

ALJ James Dixon issued an unfavorable decision on April 16, 2014. AR 1050-52. Based on the record, the ALJ made the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since November 30, 2004, the protective filing date (20 CFR 416.971 *et seq.*).

   \*\*\*

2. The claimant has the following severe impairments: borderline intellectual functioning; residuals from right shoulder rotator cuff surgery; affective mood disorder; anxiety and disorder of back (20 CFR 416.920(c)).

   \*\*\*

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

   \*\*\*

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can lift/carry (including upward pulling) 20 pounds occasionally and 10 pounds frequently. The claimant can occasionally reach overhead with the dominant right upper extremity. The claimant is able to

---

the transcript of this third hearing as "DE 20," followed by the corresponding page number(s) where appropriate.

[4] Of note, there is no indication in the record that Plaintiff sought review from the Appeals Council of the ALJ's April 16, 2014 decision. Both parties state that Plaintiff commenced the instant action in this Court following the ALJ's entry of an unfavorable decision on April 16, 2014. DE 17 at 2; DE 22 at 2. Indeed, Defendant states that this decision "became the final decision of the Commissioner." DE 22 at 2. Therefore, Plaintiff's claim satisfies the requirement contained in 42 U.S.C. § 405(g) that an individual may seek review of "any final decision of the Commissioner of Social Security made after a hearing to which [she] was a party[.]" Alternatively, even if it was determined that Plaintiff failed to exhaust her administrative remedies by foregoing an additional request for review to the Appeals Council, the Court finds that Defendant waived this requirement by asserting that the April 16, 2014 decision by the ALJ was the final decision of the Commissioner. *See Heckler v. Ringer*, 466 U.S. 602, 617, 104 S. Ct. 2013, 2023, 80 L. Ed. 2d 622 (1984) ("We have held that the Secretary herself may waive the exhaustion requirement when she deems further exhaustion futile[.]") (internal citation omitted); *Ahghazali v. Sec'y of Health & Human Servs.*, 867 F.2d 921, 926 (6th Cir. 1989) ("The exhaustion of administrative remedies requirement may be waived by the Secretary[.]").

4

understand, remember and carry out simple instructions, and perform simple routine repetitive tasks; able to make judgments for the previously described activities. She is unable to understand, remember, interact with public, coworkers and supervisors. She is able to adapt to gradual and infrequent changes, and she can perform no work requiring literacy skills.

***

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

***

6. The claimant was born on April 7, 1966 and was 38 years old, which is defined as a younger individual 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

***

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 30, 2004, the date the application was protectively filed (20 CFR 416.920(g)).

AR 1055-1069A.


### III. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

5

## IV. DISCUSSION AND CONCLUSIONS OF LAW

### A. Standard of Review

The determination of disability under the Act is an administrative decision. The only questions before this Court upon judicial review are: (i) whether the decision of the Commissioner is supported by substantial evidence, and (ii) whether the Commissioner made legal errors in the process of reaching the decision. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

The Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

6

## B. Determining Disability at the Administrative Level

The claimant has the ultimate burden of establishing an entitlement to benefits by proving her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). The asserted impairment(s) must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. §§ 432(d)(3) and 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), and 404.1513(d). "Substantial gainful activity" not only includes previous work performed by the claimant, but also, considering the claimant's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which the claimant lives, or whether a specific job vacancy exists, or whether the claimant would be hired if she applied. 42 U.S.C. § 423(d)(2)(A).

In the proceedings before the Social Security Administration, the Commissioner must employ a five-step, sequential evaluation process in considering the issue of the claimant's alleged disability. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must show that she is not engaged in "substantial gainful activity" at the time disability benefits are sought. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007); 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a severe impairment that meets the 12-month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 F. App'x 83, 85 (6th Cir. 2004). Third, if the claimant has satisfied the first two steps, the claimant is presumed disabled without further inquiry, regardless of age, education or work experience, if the impairment at issue either appears on the regulatory list of impairments that are sufficiently severe as to prevent any gainful employment or equals a listed impairment. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§ 404.1520(d), 416.920(d). A claimant is not required to show the existence of a listed

7

impairment in order to be found disabled, but such showing results in an automatic finding of disability that ends the inquiry. *See Combs, supra; Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

If the claimant's impairment does not render her presumptively disabled, the fourth step evaluates the claimant's residual functional capacity in relationship to her past relevant work. *Combs, supra.* "Residual functional capacity" ("RFC") is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1). In determining a claimant's RFC, for purposes of the analysis required at steps four and five, the ALJ is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988). At the fourth step, the claimant has the burden of proving an inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474. If the claimant cannot satisfy the burden at the fourth step, disability benefits must be denied because the claimant is not disabled. *Combs*, *supra.*

If the claimant is not presumed disabled but shows that past relevant work cannot be performed, the burden of production shifts at step five to the Commissioner to show that the claimant, in light of the claimant's RFC, age, education, and work experience, can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 402 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a claimant can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428. 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). Even if the claimant's impairments prevent the claimant from

doing past relevant work, if other work exists in significant numbers in the national economy that the claimant can perform, the claimant is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a claim at step two of the evaluative process is appropriate in some circumstances).

### C. The ALJ's Five-Step Evaluation of Plaintiff

In the instant case, the ALJ resolved the Plaintiff's claim at step five of the five-step process. The ALJ found that Plaintiff met the first two steps, but found at step three that Plaintiff was not presumptively disabled because she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ found that Plaintiff cannot return to past relevant work. At step five, the ALJ found that Plaintiff's RFC allowed her to perform light work as defined in 20 CFR 416.967(b) with express limitations to account for her severe impairments, and that considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. AR 1055-1069A.

### D. Plaintiff's Assertions of Error

Plaintiff argues that the ALJ's decision should be reversed because: (1) the ALJ improperly found that Plaintiff did not meet Listing 12.05C; (2) the ALJ improperly rejected the opinion of the treating physician; and (3) Defendant failed to include the transcript of the testimony from the final hearing in the administrative record. DE 17 at 27-31. Plaintiff therefore

requests that the Commissioner's decision be reversed or, alternatively, that this case be remanded for further consideration. *Id.* at 31.

Sentence four of 42 U.S.C. § 405(g) states the following:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3). "In cases where there is an adequate record, the [Commissioner's] decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery*, 771 F.2d at 973. Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a claimant's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994). The Court will address each of Plaintiff's assertions of error below.

**1. Whether Plaintiff's condition meets Listing 12.05C.**

Plaintiff first argues that the ALJ erred by failing to find that her impairments meet the requirements of Listing 12.05C. Plaintiff's brief recites the findings of various consultative examiners who evaluated her condition, including Mary Kay Matthews, Mark Loftis, Dr. Jerry Campbell, Dr. Philip Barkley, and Dr. Paul Lima. DE 17 at 28-30. Plaintiff notes that she demonstrated a full scale IQ of 61 in 2005, 53 in 2010, 53 again in 2013, and 48 in 2014. *Id.* at 28-29. She cites her testimony that she was unable to help her daughters with homework, and also points to other impairments that allegedly cause significant functional limitations, including shoulder problems, back pain, bowel problems, and bipolar disorder. *Id.*

10

The claimant bears the burden of demonstrating that she has or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000) (citing *Burgess v. Secretary of Health & Human Servs.,* 835 F.2d 139, 140 (6th Cir. 1987)). The alleged impairment must meet all of the listing's specified criteria, as an impairment that "manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891, 107 L. Ed. 2d 967 (1990).

Listing 12.05, which involves intellectual disability, requires a claimant to demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e. … onset of the impairment before age 22." 20 C.F.R. § 404, Subpt. P, App. 1.[5] In order to meet Listing 12.05C, the claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]" *Id.* As summarized by the Sixth Circuit, the claimant must satisfy three criteria to demonstrate disability under Listing 12.05: (1) significantly subaverage intellectual functioning with deficits in adaptive functioning that initially manifested prior to age 22; (2) a valid verbal, performance, or full scale IQ score of 60 through 70; and (3) a physical or other mental impairment that significantly limits the claimant's ability to work. *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697 (6th Cir. 2007) (internal citation omitted).

Despite Defendant's argument otherwise, the Court finds that Plaintiff meets both the second and third prongs of this test. With respect to the second prong, there are four separate

---

[5] The phrase "intellectual disability" has replaced the previous term, "mental retardation," in Listing 12.05. The Court will refer to "mental retardation" in some instances out of necessity due to the term's use throughout the record. However, the terms are interchangeable for purposes of the instant Report & Recommendation.

examiners in the record who completed reports that concluded that Plaintiff has a full scale IQ of less than 70. In 2005, Ms. Matthews assigned a score of 61, and additionally assigned verbal and performance IQ scores of 64. AR 753. Mr. Loftis, a psychological examiner, assigned a score of 53 in 2010. AR 239. In 2013, Dr. Campbell assigned a score of 53 (AR 1401), and in 2014, Dr. Barkley assigned a score of 48. AR 1106. The ALJ specifically gave "great weight" to the opinions of Ms. Matthews, Mr. Loftis, and Dr. Campbell. AR 1060-61.[6]

However, despite assigning "great weight" to these opinions, the ALJ proceeded to reject the IQ scores assigned in each of the opinions:

> Listing 12.05 requires a "valid" IQ test to be reliable. The very low scores on IQ tests are not consistent with the record, therefore, they are not valid. The claimant's childhood IQ test showed [full scale] IQ of 83. The claimant has obtained a driver's license. She drives regularly. She worked at Taco Bell for about two years. She scored a [full scale] IQ of 83 as a child. At recent intellectual testing, the examiner felt the claimant was exaggerating symptoms and giving poor effort on testing. Three out of four consultative psychologists in the record agree the claimant suffers no more than moderate limitations in ability for concentration, persistence and pace. The overall record shows the claimant functions in the borderline intellectual functioning range of intellectual functioning. As such, the claimant's cognitive impairment does not meet listing 12.05 or any of the sub-listings of [L]isting 12.05.

AR 1063. Notably, the "[t]hree out of four consultative psychologists" who "agree the claimant suffers no more than moderate limitations in ability for concentration, persistence and pace" are the same three examiners who all determined that Plaintiff's full scale IQ score was less than 70.

While an ALJ who accords "great weight" to an opinion is not required to adopt that opinion wholesale, *Bennett v. Colvin*, No. 3:13-cv-1176, 2015 WL 153950, at *13 (M.D. Tenn. Jan. 12, 2015), the ALJ in this case used the functional limitations provided in the assessments of Ms. Matthews, Mr. Loftis, and Dr. Campbell as support for rejecting the full scale IQ scores provided in those very assessments. This does not follow logic, as those IQ scores formed at least

---

[6] The ALJ gave "little weight" to Dr. Barkley's opinion because "[Dr. Barkley] admitted the test scores were questionable in light of the claimant's functioning." AR 1062.

part of the basis for the functional limitations ascribed by the examiners. Indeed, Mr. Loftis specifically identified "measured IQ" as a factor that supported the restrictions contained in his evaluation. AR 234.

The ALJ additionally stated that the "overall record shows the claimant functions in the borderline intellectual functioning range," yet the Court notes that three out of the four consultative psychologists identified in the opinion determined that Plaintiff instead operates at the mild mental retardation ("MMR") level. AR 242, 736, 747, 753, 1107. Two of those three opinions, those of Ms. Matthews and Mr. Loftis, were accorded "great weight" by the ALJ. AR 1060. The ALJ's emphasis on Plaintiff's "poor effort" during an examination by Dr. Barkley does not negate the ALJ's own decision to accord great weight to two separate reports indicating that Plaintiff suffers from MMR, both of which were deemed to contain valid test results. AR 239, 753.

Despite this evidence, Defendant cites Tenth Circuit precedent to support its position that the ALJ is permitted to find that an examiner's calculation of a claimant's IQ is invalid if that same examiner determined that the claimant's actual functioning was greater than that reflected by the IQ score. *See Lax v. Astrue*, 489 F.3d 1080 (10th Cir. 2007). As noted, that is not the case, however, in two of the three consultative examination reports to which the ALJ accorded "great weight." Both Mr. Loftis and Ms. Matthews concluded that Plaintiff was operating at the level of MMR functioning. AR 242, 754.

Moreover, the Tenth Circuit in *Lax* noted that none of the examiners who evaluated the claimant had vouched for the validity of the IQ tests that were administered, both clinicians who examined the claimant opined that he operated in the borderline intellectual functioning level, and there were significant variations in the IQ test results that raised questions about their

validity. *Lax*, 489 F.3d at 1086-1088. Here, Mr. Loftis stated that Plaintiff "put forth good effort during the course of the evaluation," and that there was "no evidence of malingering." AR 240. After calculating a full scale IQ score of 53, which actually fits the criteria contained in the more severe Listing 12.05B, Mr. Loftis noted that Plaintiff's score was "consistent to [sic] her educational history provided," and was "believed to be an accurate measurement of her general intellectual abilities[.]" AR 239, 242. Ms. Matthews, who found verbal, performance, and full scale IQ scores that all fell between 60 and 70, similarly concluded that Plaintiff was "a credible source of information," stated that her findings were considered to be valid, and opined that "an accurate overall picture of the claimant was obtained during this assessment." AR 754.

Additionally, the four IQ tests administered by consultative examiners yielded relatively consistent scores. From 2005 to 2014, Plaintiff received full scale IQ scores of 61, 53, 53, and 61. AR. 239, 753, 1104, 1403. Even Dr. Barkley, who ultimately questioned the validity of the IQ score of 53 derived as part of his evaluation, noted that Plaintiff's verbal, performance, and full scale IQ scores were consistent with prior testing. AR 1104. The Court thus concludes that substantial evidence does not support the ALJ's decision to reject the IQ scores assessed by Ms. Matthews and Mr. Loftis, and further finds that Plaintiff satisfies the second prong of Listing 12.05C as delineated by the *West* court.[7]

The Court also finds that Plaintiff meets the third prong of Listing 12.05C, which requires a physical or separate mental impairment that imposes "an additional and significant work-related limitation of function." 20 C.F.R. § 404, Subpt. P, App. 1. The ALJ found that Plaintiff

---

[7] This conclusion is further supported in the record by: the 64 verbal score, the 64 performance score, and the 61 full scale IQ score rendered in the opinion of Ms. Matthews, which was given "great weight" by the ALJ; the affirmation by Ms. Matthews that such scores represented a "valid estimate" of Plaintiff's intellectual capacity (AR 753); and the consistency of these scores with subsequent IQ scores rendered by other examiners.

14

has severe impairments consisting of residuals from right shoulder rotator cuff surgery, affective mood disorder, anxiety, and a disorder of the back. AR 1056. Despite discounting the opinion of Plaintiff's treating physician, Dr. Douglas Freels, an orthopedist who provided the only opinion regarding Plaintiff's physical limitations (AR 704-707, 1067), the ALJ determined that Plaintiff would be limited to light work with additional restrictions, including lifting and carrying 20 pounds occasionally and 10 pounds frequently, and occasionally reaching overhead with her dominant right upper extremity. AR 1063. The ALJ also imposed additional mental restrictions that limited Plaintiff's ability to understand, remember, and carry out simple instructions, perform simple routine repetitive tasks, occasionally interact with the public, coworkers, and supervisors, and adapt to gradual and infrequent changes. *Id*. The ALJ further noted that Plaintiff could perform no work that required literacy skills, and concluded that Plaintiff would be unable to perform any past relevant work. AR 1063, 1069.

The foregoing restrictions satisfy the "additional and significant work-related limitation of function" requirement because the inability to perform one's past work and a reduction in one's overall exertion level are "significant" limitations pertaining to one's ability to perform work. *Yates v. Astrue*, No. 3:05-0546, 2009 WL 2611276, at *13 (M.D. Tenn. Aug. 25, 2009) (citing *Mowery*, 771 F.2d at 972; *Gribbins v. Apfel*, 14 F. App'x 491, 492 (6th Cir. 2001)). The Court also notes that Defendant does not dispute that Plaintiff meets the third prong. DE 22 at 11.

The issue, therefore, is whether Plaintiff meets the first prong of the test, which requires a determination of whether she demonstrated significantly subaverage intellectual functioning with deficits in adaptive functioning that initially manifested prior to age 22. Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living

15

skills. *West*, 240 F. App'x at 698 (citing *Heller v. Doe by Doe,* 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993)). Adaptive functioning is described by the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-V") as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background," and involves "adaptive reasoning in three domains: conceptual, social, and practical." DSM-V at 37. A claimant demonstrates deficits in adaptive functioning when she demonstrates that "at least one domain of adaptive functioning … is sufficiently impaired that ongoing support is needed in order for the [claimant] to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id*. At 38.

Here, the ALJ concluded that Plaintiff did not show deficits in adaptive functioning because she demonstrated "through her adaptive functioning of working jobs, daily activities, taking care of children, and other factors that she is capable of completing many mental work-related activities." AR 1059. Defendant additionally argues that Plaintiff is able to "maintain a household," drive, and "handle her finances." DE 22 at 7-8. However, the record is rife with examples of Plaintiff struggling in each of these areas. For example, despite Defendant's claim that Plaintiff can "handle her finances," she has consistently demonstrated a need for assistance with financial matters. Mr. Loftis, Dr. Barkley, and Dr. Campbell each noted that members of Plaintiff's family help pay bills. AR 238, 1107, 1404. Each of these examiners also opined that Plaintiff would need assistance in handling any disability benefits received in this case. AR 242, 1107, 1404. Plaintiff testified during her most recent hearing that her daughters pay her bills (DE 20 at 39), and the ALJ specifically acknowledged Plaintiff's need for assistance with finances in the opinion. AR 1061.

16

With respect to Plaintiff's ability to care for children, the record consistently shows that Plaintiff receives assistance from family members. Dr. Barkley's report notes that Plaintiff obtained custody of her grandchildren to prevent them from being placed in the foster care system, and that at least one of her daughters assists her in caring for the grandchildren. AR 1104. Mr. Loftis similarly noted that one of Plaintiff's daughters comes to her house to watch the children during the day, and that the children assist her with household chores. AR 238. Dr. Campbell also noted that Plaintiff's daughters do chores for her, including grocery shopping for her. AR 1404. Ms. Matthews noted that Plaintiff's grandchildren "get themselves up and ready for school." AR 751.

During her hearing, Plaintiff testified that her grandchildren are "helpful" and "always waiting on me and asking me do I need something to eat or something to drink … They help me out a whole lot." AR 1481. This is significant when contrasted with the ALJ's conclusion that Plaintiff has only mild restriction in her activities of daily living based on her ability to "help take care of small children at home, which can be quite demanding, both physically and emotionally" (AR 1057), because the Sixth Circuit has held that rearing children with assistance from others does not negate a claimant's low IQ scores. *See Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 463 (6th Cir. 2012) (holding that mothering children with other parental assistance is not inconsistent with an intellectual disability).

The ALJ additionally determined that Plaintiff did not show deficits in adaptive functioning based on her ability to "work[] jobs." AR 1059. The ALJ was especially persuaded by her employment at Taco Bell, as he referenced Plaintiff's two-year stint at Taco Bell eight separate times in the opinion. AR 1057-58, 1060-61, 1063-64, 1066. Plaintiff testified, however,

17

that she was unable to work as a cashier at this job and was relegated to preparing food and cleaning bathrooms. AR 1474.

Notwithstanding Plaintiff's brief tenure at Taco Bell, the ALJ appropriately discussed Plaintiff's testimony that she had never been fired from a position and explained the relevance of this evidence:

> [T]he claimant mentioned several jobs she worked in the past, and the claimant always stopped working the jobs for reasons unrelated to medical impairments or symptoms. For instance, the claimant worked as a cook for a while, but she stopped because the restaurant slowed down and cut her hours. She worked in apparel for a while, and she stopped working there because of a divorce. She stopped working in childcare because the number of kids reduced to the point where they did not need her to work very often. She stopped working at a different day care center when they closed down. The longitudinal record shows the claimant stopped working various jobs for reasons unrelated to medical impairments or impairment-related symptoms or limitations. This suggests her current lack of work activity might be due to reasons other than medical issues.

AR 1066. Such a work history perhaps weighs against Plaintiff's claim of intellectual disability, as there is no indication that Plaintiff was forced to stop working due to any mental impairment. However, a work history that is limited to unskilled labor, i.e. jobs that "do not emphasize conceptual skills" (DSM-V at 34-35), is consistent with deficits in adaptive functioning as described by Listing 12.05C. *Davis v. Colvin*, No. 2:10-cv-0088, 2015 WL 3504984, at *5 (M.D. Tenn. May 28, 2015). *See also Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir. 1991) (holding that work as a truck driver was not inconsistent with a valid IQ score of 68 where subject claimant was required to record the hours he worked, the places he drove, and his mileage). Plaintiff's work history consists of employment at day care facilities, work as a cook, and preparing food and cleaning bathrooms at Taco Bell, none of which qualifies as work that "emphasizes conceptual skills."

18

The ALJ also provided the following summary of her conclusion that Plaintiff operates at the borderline intellectual functioning level:

> The very low scores on IQ tests are not consistent with the record, therefore, they are not valid. The claimant's childhood IQ test showed [full scale] IQ of 83. The claimant has obtained a driver's license. She drives regularly. She worked at Taco Bell for about two years. She scored a [full scale] IQ of 83 as a child. At recent intellectual testing, the examiner felt the claimant was exaggerating symptoms and giving poor effort on testing. Three out of four consultative psychologists in the record agree the claimant suffers no more than moderate limitations in ability for concentration, persistence and pace. The overall record shows the claimant functions in the borderline intellectual functioning range of intellectual functioning.

AR 1063. The Court finds this explanation problematic. Obtaining a driver's license does not prove that Plaintiff's low IQ scores are invalid. *See Brown*, 948 F.2d at 270 (having a driver's license not inconsistent with a valid IQ score of 68). Plaintiff also testified that someone had to read the written part of the examination to her in order for her to pass the test. DE 20 at 21. Additionally, as discussed *supra*, Plaintiff's job at Taco Bell, in which she was unable to work as a cashier and instead prepared food and cleaned bathrooms, involved unskilled labor that is not inconsistent with the adaptive limitations requirement of Listing 12.05C.

Furthermore, as discussed above, the ALJ's selective analysis in discounting Plaintiff's low IQ scores based on the fact that "[t]hree out of four consultative psychologists in the record agree the claimant suffers no more than moderate limitations in ability for concentration, persistence and pace" is inconsistent with the specific statements of two of those three examiners that the low IQ scores rendered during their testing represented valid results that were both reflective of Plaintiff's true ability and consistent with her educational history. AR 242, 753-54. Additionally, and more significantly, the ALJ's justification mistakenly assumes that demonstrating a "moderate" limitation in ability to sustain concentration, persistence, and pace precludes a finding that Plaintiff's impairment meets Listing 12.05C. In reality, the plain

19

language of Listing 12.05C requires a showing of "deficits in adaptive functioning," although there is no specification as to how severe such deficits must be.

The regulations define "loss of adaptive functioning" as being "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P, App. 1. The ALJ ultimately concluded that Plaintiff's moderate limitations with respect to concentration, persistence, and pace "would allow the claimant to perform simple work tasks" (AR 1060), yet such a determination is not inconsistent with Listing 12.05C. *See Brown*, 948 F.2d at 270 (holding that IQ score of 68 is not inconsistent with receiving a driver's license, working as a truck driver, being able to make change at a grocery store, doing laundry, and cleaning one's room); *Wilson v. Astrue,* No. 07–439, 2009 WL 69237, at *5 (E.D. Ky. Jan. 9, 2009) (claimant's ability to sustain concentration and interact with others not inconsistent with listing 12.05C); *Craig v. Comm'r of Soc. Sec.*, No. 1:14-cv-966, 2015 WL 8207480, at *17, n.14 (S.D. Ohio Dec. 7, 2015), *report and recommendation adopted*, No. 1:14-cv-966, 2016 WL 108072 (S.D. Ohio Jan. 11, 2016) ("[I]f the diagnostic description for Listing 12.05 requires more than moderate deficits of adaptive functioning as the Commissioner suggests, Listing 12.05[C]—which requires an IQ of 60 through 70 and marked restrictions in at least two areas of mental functioning—would be rendered superfluous."). Indeed, according to the reports completed by Mr. Loftis and Dr. Campbell, this "moderate" limitation indicates that Plaintiff has "more than a slight limitation" in the area of concentration, persistence, and pace (AR 234, 1406), which would arguably satisfy the criteria for deficits in adaptive functioning.

Nevertheless, the Court must conclude that substantial evidence supports the ALJ's determination that Plaintiff does not meet the diagnostic criteria of Listing 12.05C based on her

failure to demonstrate significantly subaverage intellectual functioning with deficits in adaptive functioning that initially manifested prior to age 22. The Court notes that a claimant is not required to demonstrate an IQ score in the intellectual disability range to meet Listing 12.05C. *See West*, 240 F. App'x at 698 ("While the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period … a claimant is by no means *required* to produce an IQ score obtained prior to age 22) (emphasis in original). However, Plaintiff in this case has produced an IQ score obtained prior to age 22 demonstrating that, at worst, she fell in the borderline range of intellectual functioning with respect to her verbal abilities. AR 232. Plaintiff's full scale IQ actually demonstrated intellectual functioning at the "dull normal range." AR 232. The psychological examiner also noted that Plaintiff was "within the average range in the performance scale," and opined that the IQ scores were "felt to represent an underestimate of the [Plaintiff's] current cognitive strengths." AR 231-32.

Plaintiff additionally points to her participation in resource classes and achievement of a special education diploma to support her argument. DE 17 at 28. However, as noted by Defendant, a special education diploma alone does represent sufficient evidence to meet the diagnostic criteria required by Listing 12.05C. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) ("[T]his Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two."). This is true even when a history of special education is considered in conjunction with a qualifying IQ score obtained as an adult. *See Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 540 (6th Cir. 2014) ("[N]either circumstantial evidence such as school records nor a

history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two.").

Moreover, there is no evidence in the record that Plaintiff has ever been diagnosed with an intellectual disability by a treating physician. While such a diagnosis is not required to reach the threshold of Listing 12.05C, the lack thereof can have bearing on a determination of whether the listing is met. *See Peterson*, 552 F. App'x at 539 ("Although an MMR diagnosis is not a necessary prerequisite to satisfy Listing 12.05, its absence is probative for a 12.05C determination.") (citing *Cooper v. Comm'r of Soc. Sec.,* 217 F. App'x 450, 452 (6th Cir. 2007)). Instead, two examiners, Ms. Matthews and Mr. Loftis, who evaluated Plaintiff on a single occasion without the benefit of reviewing any of her medical records, determined that Plaintiff's measured IQ scores placed her in the MMR range of intellectual functioning. AR 242, 753. While these consultative examinations represent evidence in support of Plaintiff's argument, it was not unreasonable for the ALJ to rely instead on Dr. Campbell's determination that Plaintiff fell within the borderline range of intellectual functioning (AR 1404), or on Dr. Barkley's opinion that Plaintiff's low IQ scores were "questionable" in light of her severe lack of effort during testing. AR 1106. The Court also notes that the ALJ gave "some weight" to the opinion of Dr. Larry Wheeler (AR 1067), who performed a psychiatric review technique after reviewing Plaintiff's records and determined that she fell within the borderline range of intellectual functioning. AR 747.

As long as an ALJ's decision is supported by substantial evidence, reversal is not warranted even if substantial evidence would support the opposite conclusion. *Ulman v. Comm'r of Soc. Sec*., 693 F.3d 709, 714 (6th Cir. 2012) (citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Here, the ALJ appropriately determined that Plaintiff did not satisfy the diagnostic

criteria contained in Listing 12.05, thus precluding Plaintiff from meeting all of the criteria necessary to satisfy Listing 12.05C. The Court therefore finds that substantial evidence supports this determination, and rejects this assertion of error.

**2. The ALJ's consideration of the treating physician's opinion.**

Plaintiff next contends that the ALJ erred by rejecting the opinion of her treating physician, Dr. Freels. After citing relevant case law and SSR 96-2p's directive that a treating physician's opinion be given controlling weight if it is not inconsistent with the other substantial evidence of record, Plaintiff does little more than note that she "frequently complained to her primary care doctors about her shoulder complaints," which she argues refutes the ALJ's explanation for rejecting Dr. Freels's opinion. DE 17 at 30-31. The Court notes that Plaintiff fails to cite to any medical records that would support this assertion.

It is well-established that a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must provide "good reasons" for the weight that is assigned to the opinion. *Id.*

As discussed by the ALJ, Dr. Freels opined that Plaintiff would be limited to "occasionally" lifting less than 10 pounds, "occasionally" reaching in all directions, and "limited" in her ability to push and pull. AR 704-05. Dr. Freels also found that Plaintiff's pain would "often" interfere with her attention and concentration. AR 705. He further stated that Plaintiff would need to take unscheduled breaks during an eight-hour workday and would likely miss one day of work per month due to her physical impairment. AR 705.

23

Despite the paucity of Plaintiff's argument, the Court acknowledges that the ALJ's explanation for rejecting Dr. Freels's opinion is equally brief:

> The undersigned gives this opinion little weight because it occurred so soon after the right shoulder surgery. The medical evidence of record, extensive physical therapy, reported daily activities and record as a whole indicate the claimant did not continue to suffer physical limitations at this level of severity for twelve consecutive months or more.

AR 1067. This reasoning is both insufficient and inaccurate. For one, the Court is unaware of any regulation or opinion that places restrictions on the timeframe in which a treating physician may submit an opinion concerning the severity of a claimant's condition. The fact that Dr. Freels completed a medical source statement five months after he performed surgery on Plaintiff is not a valid reason for discounting his opinion.

The ALJ's ambiguous statement that the evidence of record indicates that Plaintiff did not continue to "suffer physical limitations at this level of severity for twelve consecutive months" is similarly unfounded because the ALJ ignored substantial evidence in the record indicating that Dr. Freels's opinion was supported by evidence of ongoing complaints of pain. Complaints of shoulder pain are documented throughout the duration of Plaintiff's treatment at Carthage Family Health Care, which lasted from April of 2007 through February of 2010. AR 313-423. In February of 2008, approximately one year and five months after her shoulder surgery, Plaintiff was unable to move her right arm behind her body due to decreased range of motion in her right shoulder. AR 340, 718. Decreased range of motion was again noted in her right shoulder during subsequent visits in March and April of 2008. AR 342, 344. Such evidence contradicts the ALJ's finding that Plaintiff's symptoms did not continue "at this level of severity for twelve consecutive months."

The record also documents ongoing shoulder issues throughout 2009, with providers continuing to prescribe Percocet for Plaintiff's right shoulder pain. AR 344-88, 378. In June of 2009, "[m]oderate to severe" pain was noted in Plaintiff's right shoulder and back. AR 388. Beginning in July of 2009, the Carthage records begin referring to "chronic pain" (AR 391), which, based on the "assessment" portion of each of the subsequent office notes, appears to cover ongoing complaints of shoulder pain, foot pain, and back pain. AR 392-422. During Plaintiff's final documented visit with Carthage on February 16, 2010, abnormalities were again noted in the right shoulder with respect to "Inspection/Palpation/Motion/Stability/Strength," including "[t]enderness to palpation and pain of the anterior right shoulder, previous rotator cuff tear surgery, slight crepitation noted to right shoulder joint to palpation and manipulation. Mild limitation with movement or resistance." AR 421.

The ALJ's decision to discount the treating physician's opinion is also puzzling because the restrictions contained therein are not drastically different than the limitations included in the assigned RFC. The only substantive difference is Dr. Freels's opinion that Plaintiff would be limited to occasionally lifting and/or carrying 10 pounds, while the ALJ determined that she would be able to occasionally lift and/or carry 20 pounds. AR 704, 1063. The ALJ provided no explanation for this modestly less restrictive limitation, and instead claimed that "[i]maging studies from Riverview Regional Medical Center in September 2013 show fairly insignificant findings regarding right shoulder. The [RFC] accommodates this impairment." AR 1064.

However, the ALJ failed to provide a citation to the alleged imaging performed by Riverview Regional Medical Center in September 2013, which is significant due to the lack of evidence in the record of any imaging studies conducted in September of 2013. Neither party references a study from September of 2013, thus leading the Court to the conclusion that no

imaging studies were actually performed in September of 2013, which further undermines the ALJ's basis for rejecting Dr. Freels's opinion. *See Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 749 (6th Cir. 2011) ("[I]naccuracies, incomplete analysis and unresolved conflicts of evidence can serve as a basis for remand.").

The ALJ additionally stated that Plaintiff's "activities of daily living … are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." AR 1065. The ALJ then recited the daily activities that Plaintiff reported to the consultative examiners, including those described by Ms. Matthews. AR 1065. While the ALJ is certainly entitled to find a claimant's testimony less than credible, his reliance on the daily activities described by Ms. Matthews in March of 2005 is less persuasive because this evaluation took place approximately 18 months before she underwent right shoulder surgery. AR 718, 749. Indeed, Plaintiff did not mention any shoulder problems to Ms. Matthews during the examination, and according to the record, her right shoulder pain did not begin until August of 2005. AR 716.

Significantly, the ALJ used the daily activities reported to Ms. Matthews in March of 2005 to refute Dr. Freels's opinion:

> She stated that she does not have any difficulty driving a vehicle. She drove herself to the exam … She does all the household tasks and she mows the yard. She is a "neat freak" and she wants everything clean. The claimant is able to begin tasks, sustain them, and complete them. She can prepare full meals. She goes to church twice a week.

AR 1065-66. Plaintiff's reported daily activities, however, are more restricted following her shoulder surgery in September of 2006. In 2010, she noted that she drove "very little" and was able to do "some cooking," but that her kids helped her with household chores. AR 238. In 2013, she claimed that she could do chores "sometimes" and that her daughter grocery shopped for her.

26

AR 1404. She also testified that she was unable to lift a large amount of laundry and could do very little cleaning around the house. DE 20 at 38. Although the ALJ noted that Plaintiff continues to remain independent in personal hygiene and toileting needs (AR 1066), the Court finds that such minimal activities do not represent substantial evidence that undermines Dr. Freels's opinion. *See Rogers*, 486 F.3d at 248-49 (activities such as driving, cleaning, doing laundry, and watching television are "minimal daily functions" that are "not comparable to typical work activities").

The requirement that the ALJ provide "good reasons" exists, in part, to "let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The Sixth Circuit has clearly held that remand is appropriate when the "good reasons" provision of 20 C.F.R. § 416.927(c) is violated. *See id.* at 545 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.") (internal citation omitted). Based on the foregoing analysis, the Court finds that the ALJ violated the treating physician rule by failing to provide good reasons for discounting the opinion provided by Dr. Freels regarding Plaintiff's physical limitations.

The Court is well aware of this case's procedural history, including the multiple instances of remand that have led to three separate ALJ opinions. The Court is also aware that the role of the reviewing court is not to "reweigh the evidence or substitute its own judgment for that of the

Commissioner." *Dalton v. Sec'y of Health & Human Servs.*, 908 F.2d 973, 1990 WL 98035, at *5 (6th Cir. 1990) (table). It is, however, the duty of this Court to ensure that there is "such relevant evidence as a reasonable mind might accept" as sufficient to support the ALJ's conclusion. *Bass v. McMahon*, 499 at 509 (quoting *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). Here, the Court finds that substantial evidence does not support the ALJ's decision to give the opinion of Dr. Freels less than controlling weight, as Dr. Freels' opinion is "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2). Therefore, the Court concludes that remand is appropriate for additional consideration of the opinion provided by Dr. Freels.

**3. Defendant's failure to include the transcript from the final hearing before the ALJ in the administrative record.**

Plaintiff finally argues that the ALJ's decision cannot be properly evaluated because the transcript from Plaintiff's most recent hearing before ALJ Dixon in September of 2013 is not present in the record. Because the undersigned recommends that this case be remanded for further consideration of the treating physician's opinion, the Court need not address this assertion of error.

### V. RECOMMENDATION

For the above-stated reasons, the undersigned Magistrate Judge respectfully recommends that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) be GRANTED and that the Commissioner's decision be REVERSED and REMANDED for further consideration in accordance with this Report and Recommendation.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state

28

with particularity the specific portions of this Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge